570 A.2d 855

**William Randolph DAVIS**

v.

**STATE of Maryland.**

**No. 83, Sept. Term, 1989.**

Court of Appeals of Maryland.

March 9, 1990.

Arthur A. DeLano, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, and ADKINS, JJ., HOWARD S. CHASANOW, Judge,* Specially Assigned, and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

McAULIFFE, Judge.

It is a violation of Maryland law to possess any device adopted for the production of controlled dangerous substances with the intent to use that device to produce, sell, or dispense any controlled dangerous substance. Maryland Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.) Art. 27,

---

\* Howard S. Chasanow, formerly a judge of the Seventh Judicial Circuit, was specially assigned to the Court of Appeals at the time this case was argued. He was sworn in as a judge of this Court on 17 January 1990.

§ 286(a)(4). The question presented here is whether a glass jar adopted for the purpose of coating parsley with phenclyclidine (PCP), or plastic "baggies" and other containers adopted for packaging or repackaging of PCP, can, under the particular circumstances of this case, be considered devices for the production of a controlled dangerous substance within the meaning of the statute. We hold that they can not.

William Randolph Davis was arrested on 23 March 1987, in Carroll County, when the vehicle he was driving was stopped by the Maryland State Police.[1] Among other items seized from the passenger compartment of the vehicle were the following:

1) a glass jar containing PCP treated parsley flake residue;

2) a glass jar containing 31.9 grams of PCP treated parsley flakes;

3) an empty one ounce container of Safeway brand parsley flakes;

4) a 35 millimeter film canister with residue;

5) two food coloring bottles containing in one a trace and in the other 28 milliliters of liquid PCP;

6) five plastic baggies containing 20.5 grams of PCP treated parsley flakes in a glass jar;

7) $1,825.00 in United States currency, taken from Davis's pockets.

Davis was charged with various offenses, and was tried before Judge Donald J. Gilmore in the Circuit Court for Carroll County. Corporal Wayne Jirsa, who had participated in the search of the vehicle, and who had experience as an undercover narcotics officer, was accepted by the defense as an expert in the field of controlled dangerous

---

[1]. The lawfulness of the arrest and subsequent seizure is not before us. It appears that the stop was based upon information given to the State Police that Davis would be transporting PCP in the particular vehicle in which he was found, at that time and place, and that Davis's privilege to drive in Maryland had been suspended or revoked.

substances. Corporal Jirsa testified that when item 1 was seized from the front passenger floor of the vehicle, there were parsley flakes clinging to the outside of the jar that were still damp with PCP, and that a strong odor of PCP emanated from the jar. He opined that Davis, and a passenger in the vehicle who was arrested with Davis, were selling parsley coated with PCP. Corporal Jirsa said they were probably using the jar identified as item 1 to coat the parsley with PCP. He described the usual process as follows:

> First, they buy the parsley flakes. Then, they pour the parsley flakes in a larger container, which would be indicative of the large glass jar. The liquid is poured in on top of the parsley flakes, and then, they just shake it and shake it.

Corporal Jirsa testified that the film canister would then be used to measure saleable quantities of the coated parsley into plastic baggies.

Judge Gilmore found Davis guilty of possession of PCP with the intent to distribute, possession of a device adopted for the production of PCP with the requisite intent, and simple possession of PCP. He imposed a sentence of 20 years imprisonment on the first of these charges, 20 years consecutive imprisonment on the second, and four years concurrent imprisonment on the third. Davis appealed to the Court of Special Appeals. That court, in an unreported opinion, affirmed the first two convictions, but vacated the judgment of conviction of the simple possession count, finding that it merged into the first charge. We granted Davis's petition for certiorari on the single issue of the sufficiency of the evidence to prove the second charge.

■ Article 27, § 286(a)(4) provides that it is a felony for any person:

> To manufacture, distribute, or possess any machine, equipment, instrument, implement, device, or combination thereof which is adopted for the production of controlled dangerous substances under circumstances which reason-

ably indicate an intention to use such item or combination thereof to produce, sell, or dispense any controlled dangerous substance in violation of the provisions of this subheading.

Article 27, § 277 provides the following definitions:

"Production" includes the manufacture, planting, cultivation, growing, or harvesting of a controlled dangerous substance.

"Manufacture" shall mean the production, preparation, propagation, compounding, conversion or processing of a controlled dangerous substance either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis and includes any packaging or repackaging of the substance or labeling or relabeling of its containers. . . .

The argument is made that because "production" means "manufacture", and "manufacture" means packaging or repackaging of a controlled dangerous substance, a conviction is proper under § 286(a)(4) when a defendant is shown to have possessed jars, baggies, canisters, or the like for the packaging or repackaging of PCP for purposes of sale or distribution. The fallacy in this argument lies in the interpretation of the definition of "manufacture".

In attempting to determine the intent of the legislature, "we look first to the words of the statute, read in the light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence." *Cunningham v. State*, 318 Md. 182, 185, 567 A.2d 126 (1989). Ofttimes we are able to look to the Uniform Controlled Dangerous Substances Act, 9 U.L.A. 187 (1978) for assistance in determining the intent of the legislature in enacting the Maryland Controlled Dangerous Substances Act, because the Maryland Act was modeled on the Uniform Act. *See Cunningham v. State, supra*, 318 Md. at 186, 567 A.2d 126. In this instance, however, that source is of no assistance, because § 286(a)(4) has no counterpart in the Uniform Act. Nor do we find any

specific legislative history in Maryland bearing on this precise question.

Clearly, the general intent of the legislature in passing the Maryland Act was to "prevent [the abuse of controlled dangerous substances] which results in a serious health problem to the individual and represents a serious danger to the welfare of the people of the State of Maryland." Article 27, § 276. Additionally, as we pointed out in *Cunningham, supra,* 318 Md. at 189, 567 A.2d 126, we agree that:

> [T]he history of the narcotics legislation in this country "reveals the determination of Congress to turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter." [2]

That the General Assembly clearly intended to take a hard line on the illegal manufacture, distribution, and use of controlled dangerous substances does not mean, however, that we are free to apply a strained construction to a penal statute in order to affirm a conviction. As our predecessors said more than a century ago:

> No man incurs a penalty unless the act which subjects him to it, is clearly, both within the spirit and letter of the statute. Things which do not come within the words are not to be brought within them by construction.

*Cearfoss v. State,* 42 Md. 403, 407 (1875). Penal statutes, as a general rule, are strictly construed, *Jones v. State,* 304 Md. 216, 220, 498 A.2d 622 (1985), "by which is meant that courts will not extend the punishment to cases not plainly within the language used," *State v. Archer,* 73 Md. 44, 57, 20 A. 172 (1890).

In this case, we believe the legislative intent is made manifest by the words of the statute, and particularly the definition of "manufacture" found in § 277(p). This statutory definition does not include the packaging or repackaging of *any* controlled dangerous substance. It includes

---

**2.** *Albernaz v. United States,* 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981), quoting in part from *Gore v. United States,* 357 U.S. 386, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958).

only packaging or repackaging of controlled dangerous substances that have been manufactured in the manner described by the legislature. The language of § 277(p) concerning "packaging or repackaging of *the* substance or labeling or relabeling of *its* containers" refers back to the controlled dangerous substance that is produced by extraction or by means of chemical synthesis, or by both means.

The obvious legislative intent was to include packaging and labeling within the definition of "manufacture" when that packaging or labeling is in conjunction with a true manufacturing process. Although there was evidence that Davis possessed certain items for use in coating parsley with PCP, and therefore to make the PCP more readily saleable, this did not involve production of a controlled substance by extraction or by means of chemical synthesis or by a combination of those methods. There is no evidence that Davis was manufacturing PCP, and neither the application of PCP to parsley nor the packaging or repackaging of the coated parsley can properly be called manufacturing. If it is not manufacturing, it cannot fit within the statutory definition of "production". Accordingly, the evidence is lacking that Davis possessed any device adopted for the production of controlled dangerous substances.

The evidence, while sufficient to support the conviction of possession of PCP with the intent to distribute, was insufficient to support the conviction of possession of a device adopted for the production of PCP.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENTS OF CONVICTION OF VIOLATIONS OF ARTICLE 27, § 286(a)(4) (POSSESSION OF DEVICE FOR PRODUCTION OF PCP) AND OF § 287 (POSSESSION OF PCP), AND TO AFFIRM THE JUDGMENT OF CONVICTION OF A VIOLATION OF § 286(a)(1) (POSSESSION OF PCP WITH INTENT TO DISTRIBUTE); COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS

TO BE PAID TWO-THIRDS BY CARROLL COUNTY AND ONE-THIRD BY PETITIONER.

CHASANOW and ORTH, JJ., dissent.

Dissenting opinion by ORTH, Judge, in which CHASANOW, Judge, joins.

The majority reverses in part and affirms in part the judgment entered by the Court of Special Appeals in *William Randolph Davis v. State,* No. 1386, September Term, 1988, filed 4 May 1989, unreported. They remand to that court

> with instructions to vacate the judgments of conviction of violations of Article 27, § 286(a)(4) (possession of device for production of PCP) and of § 287 (possession of PCP), and to affirm the judgment of conviction of a violation of § 286(a)(1) (possession of PCP with intent to distribute).

I would affirm the judgment of conviction entered as to the violation of § 286(a)(4).

Md.Code (1957, 1987 Repl.Vol.) Art. 27, § 286(a)(4) provides that it is unlawful, except as otherwise authorized, for any person:

> To manufacture, distribute or possess any machine, equipment, instrument, implement, device or combination thereof which is adopted for the production of controlled dangerous substances under circumstances which reasonably indicate an intention to use such item or combination thereof to produce, sell, or dispense any controlled dangerous substance in violation of the provisions of this subheading [(Health-Controlled Dangerous Substances)].

The difference of opinion between the majority and me is based on our disparate views of what is meant by the word "production." I think that the view of the majority is contrary to the purpose of the controlled dangerous substances laws, the letter of the law, and the legislative intendment.

Illegal traffic in and unlawful use of drugs has long troubled the Legislature. Its concern was evidenced from time to time by the enactment of legislation in attempts to curb the problems arising from such traffic and use. Acts 1935, Ch. 59 established a Maryland Uniform Narcotic Drug Act. *See* Md.Code (1957, 1967 Repl.Vol.), Art. 27, §§ 276–313C. The pervasive drug problem, with all its evil ramifications, persisted. So in 1970, the General Assembly enacted a new Controlled Substances Act. The former Maryland act was superseded by a comprehensive scheme. The new act substantially adopted the Uniform Controlled Substances Act, *see* 9 (Part Two) U.L.A. 11 (1988), which generally reflected the concepts developed in the Federal Controlled Substances Act, 21 U.S.C.A. § 801 (1970). *See* Md. Commissioners on Uniform State Laws, Report to the Gen. Assembly of 1971, at 5 (1971); Perito, Pinco, and Duerk, *Treatment Alternatives to Non–Incarceration For Drug–Abusing Defendants*, 2 U.Balt.L.Rev. 187, 193 (1973); Uniform Controlled Substances Act, 9 (Part Two) U.L.A. 5 (prefatory note) (1988). The Legislature expressly set out its aims:

The General Assembly finds and declares that the illegal manufacture, distribution, possession, and administration of controlled dangerous substances have a substantial and detrimental effect on the health and general welfare of the people of the State of Maryland. It is the purpose of this subheading to establish a uniform law controlling the manufacture, distribution, possession, and administration of controlled dangerous substances and related paraphernalia in order to insure their availability for legitimate medical and scientific purpose, but to prevent their abuse which results in a serious health problem to the individual and represents a serious danger to the welfare of the people of the State of Maryland.

Article 27, § 276(a). The Legislature commanded that the provisions of the act "be liberally interpreted and construed so as to effectuate its general purpose as stated hereinabove." Section 276(b).

Conduct which resulted in Davis's conviction was proscribed by the 1970 Act and codified as Article 27, § 286(a)(4).[1] The section has two aspects. The first aspect is with respect to the unlawful possession of specified items. The second aspect is with respect to the intent with which the items are possessed. It is only when, in the circumstances of their possession, the items fall within the contemplation of § 286(a)(4) that the second (the "intent") aspect of the section comes into play.

The application of § 286(a)(4) is haunted by that old ghost, legislative intent. Often, in an attempt to lay the ghost to rest, this Court must "seek to discern some general purpose, aim or policy reflected in the statute." Sykes, *A Modest Proposal for a Change in Maryland's Status Quo,* 43 Md.L.Rev. 647, 653 (1984). For, as Judge Adkins said in writing for the Court in *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987):

> [I]t is fair to say that legislation usually has some objective, goal, or purpose. It seeks to remedy some evil, to advance some interest, to attain some end.

As to the Act of 1970, however, there is no need to seek the purpose beyond the words of the statute. The Legislature, as noted, *supra,* expressly set out the objective, goal, and purpose of its Controlled Dangerous Substances Act.

With the general purpose of the statute as a given, I turn to the specific purpose of § 286(a)(4) and its place in the fulfillment of the general purpose. I look to ascertain the intendment of the Legislature when it used the words "machine," "equipment," "instrument," "implement," "device," "adopted" and "production" in the possession aspect of § 286(a)(4). Of those words, only "production" was provided legislative definition. Section 277(u) declared:

---

**1.** Provisions comparable to those in Article 27, § 286(a)(4) were not present in the Federal act, the Uniform act or in the 1935 Maryland Act. As is not uncommon with respect to many past statutory enactments, the legislative history of § 286 is sparse. Legislative council reports furnish no clue as to the source of the § 286(a)(4) provisions or how they came to be included in the 1970 Act.

"Production" includes the manufacture, planting, cultivation, growing or harvesting of a controlled dangerous substance.

It is significant, however, that "manufacture" was also defined. Section 277(p) stated:

"Manufacture" shall mean the production, preparation, propagation, compounding, conversion or processing of a controlled dangerous substance either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis and includes *any packaging or repackaging of the substance or labeling or relabeling of its containers* [except for certain exceptions not here applicable].

(Emphasis added). Although several other words and terms appearing in § 286(a)(4) were defined by the Legislature,[2] the definition of the words "machine," "equipment," "instrument," "implement," "device," and "adopted" was not supplied by the Legislature. Therefore, it is reasonable to assume that the Legislature intended the words undefined by it carry the meaning, appropriate in the context of the statute, which is applied to them in common usage during the pursuit of everyday affairs.

Webster's Third New International Dictionary of the English Language (unabridged, 1968) furnishes definitions relevant herein:

*Machine* —"a device ... for doing work beyond human physical or mental limitations or faster than human hand or mind."

*Equipment* —"the implements ... used in an operation or activity."

*Instrument* —"a means by which something is achieved, performed, or furthered."

---

**2.** *See* § 277(k)—*Dispense;* (1)—*Distribute;* (s)—*Possession.* The definitions were part of the 1970 act.

> *Implement*—"a tool or utensil forming part of equipment for work."
>
> *Device*—"a piece of equipment or a mechanism designed to serve a special purpose or perform a special function."
>
> *Adopted*—"employed."

It appears that, niceties aside, "machine," "equipment," "instrument," "implement," and "device" are, to all practical purpose and effect in the context of the section, synonymous, and this opinion refers to them collectively as a "device." Boiled down, the first aspect of § 286(a)(4) simply declares, as I see it, that, in the frame of reference of this case, it is unlawful to possess[3]

> any device employed to package or repackage controlled dangerous substances.

The majority concedes that the items found in Davis's possession, in light of Corporal Jirsa's expert opinion, were devices in the contemplation of § 286(a)(4). And they do not dispute that "production" includes "manufacture." But they maintain that the statutory definition of manufacture

> does not include the packaging or repackaging of *any* controlled dangerous substance. It includes only packaging or repackaging of controlled dangerous substances that have been manufactured in the manner described by the legislature. The language of § 277(p) concerning "packaging or repackaging of *the* substance or labeling or relabeling of *its* containers" refers back to the controlled dangerous substance that is produced by extraction or by means of chemical synthesis, or by both means.

At 61–62 (emphasis in original). The majority asserts:

> The obvious legislative intent was to include packaging and labeling within the definition of "manufacture" when

---

**3.** Article 27, § 277(s) states: " 'Possession' shall mean the exercise of actual or constructive dominion or control over a thing by one or more persons." Davis does not dispute his possession of the seized articles.

that packaging or labeling is in conjunction with a true manufacturing process. Although there was evidence that Davis possessed certain items for use in coating parsley with PCP, and therefore to make the PCP more readily saleable, this did not involve production of a controlled substance by extraction by means of chemical synthesis or by a combination of those methods.

*Id.* at 62. The majority concludes:

There is no evidence that Davis was manufacturing PCP, and neither the application of PCP to parsley nor the packaging or repackaging of the coated parsley can properly be called manufacturing. If it is not manufacturing, it cannot fit within the statutory definition of "production." Accordingly, the evidence is lacking that Davis possessed any device adopted for the production of controlled dangerous substances.

I do not agree. I cannot accept the notion that the Legislature intended, in defining "manufacture," to include "any packaging or repackaging of [controlled dangerous substance] or labeling or relabeling of its containers," to restrict the packaging or labeling of a substance to a substance which was manufactured by the packager. In other words, for there to be a violation in the contemplation of § 286(a)(4), the packaging or labeling must be tied to the making of the substance—that is, the section does not proscribe the packaging or labeling of a substance already manufactured. This notion makes the "packaging and labeling" phrase in the definition of "manufacture" superfluous, and statutes should not be so interpreted. *See Warfield v. State,* 315 Md. 474, 499–500, 554 A.2d 1238 (1989). The statutory definition of "production" includes "manufacture," and the statutory definition of "manufacture" includes "any" packaging or labeling of the substance. The definitions should be considered in light of Corporal Jirsa's opinion that the items seized were used in a way that is usual and customary in the illegal drug trade. Heed must be taken of the command of the Legislature that the provisions of the controlled dangerous substances law "be lib-

erally interpreted and construed so as to effectuate its general purpose...." When the standard by which the sufficiency of the evidence is tested,[4] it follows that the judgment of the trial court in regard to the possession aspect of § 286(a)(4) was not clearly erroneous. Md.Rule 8–131(c).

This determination leads to the second aspect of § 286(a)(4)—the intent with which the items were possessed, a question not necessary for the majority to reach. The trial judge considered the quantity of the PCP seized, in pure form and spread on the parsley flakes, and the uncontradicted evidence by Jirsa's testimony of the considerable street value of those items. The judge looked at the amount of money found on Davis's person, $1,795 in one pocket segregated from $30 in another pocket. The judge observed that Davis was on work release at the time he was arrested and that there was no explanation offered for his possession of that amount of money and why it was segregated.[5] All of this, the judge opined, "suggests, inferentially, that he was involved in the sale of PCP." The inference was reasonable. The judgment of the trial court on the intent aspect of § 286(a)(4) was not clearly erroneous. The judge declared that he was "convinced, beyond a reasonable doubt and to a moral certainty, that the defendant is guilty" of the offense charged in § 286(a)(4). He found Davis guilty. The decision of the judge met the test for the sufficiency of the evidence. The verdict should stand.

Davis attempts to roil the waters by stirring in § 287(d) and § 287A(c) of Article 27. These sections focus on drug paraphernalia. They create different offenses than that created by § 286(a)(4). The Legislature made a violation of § 286(a)(4) a felony when PCP is involved. A violation of

---

**4.** The applicable standard for determining the sufficiency of the evidence is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

**5.** Davis did not offer any testimonial evidence at the guilt stage of the trial.

§ 287(d) and § 287A(c) is a misdemeanor.[6] Section 287(d) was part of the 1970 Act. Section 287A(c) came into the law by Acts 1980, Ch. 874. All three sections concern possession of certain items. Some of the items specified in § 286(a)(4) may fit the mold of those considered to be paraphernalia under §§ 287(d) and 287A(c). *See* § 287(d)(1–2) and § 287A(a)(1–12) and (b)(1–13). But § 286(a)(4) is not identical to § 287(d) or with § 287A(c) and it operates independently of the other two statutes. When the facts are such that a defendant could be charged under § 286(a)(4) or under either of the other two statutes, the prosecuting authority is free to proceed under § 286(a)(4) or under the other statutes. *See United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). *See also* 66 Op.Att'y Gen. 125 (1981). In the circumstances here, §§ 287(d) and 287A(c) had no impact whatsoever on § 286(a)(4). This is in accord with the legislative scheme of the Controlled Dangerous Substances Act. Were it otherwise, § 286(a)(4) would ofttimes be emasculated.

All of this leads me to the conclusion that the judgment of the Court of Special Appeals should be affirmed.

---

**6.** Article 27, § 286(b)(2) prescribes:

> Any person who violates any of the provisions of subsection (a) with respect to
>
> Phencyclidine ... is guilty of a felony and is subject to imprisonment for not more than 20 years, or a fine of not more than $20,000, or both.

There were minimum sentences mandated for repeat offenders. For the present sanction for repeat offenders, see Acts 1988, Ch. 439, codified as Article 27, § 286(c).

> Section 287(e) provides:
>
> Any person who violates this section shall, upon conviction, be deemed guilty of a misdemeanor and be sentenced to a term of imprisonment for not more than four (4) years, a fine of not more than twenty-five thousand dollars ($25,000), or both....

When the use or possession of marijuana is involved, the sanction is less harsh.

> Section 287A(c) provides:
>
> Any person who violates this subsection is guilty of a misdemeanor and upon conviction for a first offense may be fined not more than $500.

Harsher punishment is provided for repeat offenders.

The holding of the majority leaves a significant loophole in the controlled dangerous substances law. It may be that the Legislature will desire to fill it.

CHASANOW, J., joins in this dissent.